UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PETER J. HESS,

                          Plaintiff,

                     -against-

ING USA ANNUITY AND LIFE
INSURANCE COMPANY,

                          Defendant.
-----------------------------------------------------------------X

MEMORANDUM &
ORDER
CV-06-1844 (SMG)

Gold, S., *United States Magistrate Judge*:

## Introduction

Plaintiff, Peter J. Hess, was hired by defendant, ING, in 1994, and worked for ING in that capacity until his termination on July 31, 2004. Compl. ¶¶ 14-15. Plaintiff brings this action pursuant to Executive Law § 296 of the New York State Human Rights Law, claiming he was fired because of his age. Plaintiff was sixty-five at the time he was terminated. Compl. ¶ 16.

Defendant now moves for summary judgment, arguing that the evidence demonstrates that plaintiff was fired for legitimate, non-discriminatory reasons. The parties have consented to the assignment of this case to a Magistrate Judge for all purposes. Docket Entry 16. For the reasons stated below, defendant's motion is granted.

## Facts

Plaintiff was hired by the defendant in 1994 as a Regional Vice President at the age of fifty-four. Compl. ¶¶ 14-15; Defendant's Statement of Undisputed Material Fact ("DSUMF") ¶ 2.[1] Plaintiff's responsibilities included marketing financial products to brokers, who purchased them for clients. DSUMF ¶ 3.

---

[1] Only those statements in DSUMF not actually contested by citation to conflicting evidence in plaintiff's Rule 56.1 statement are cited here.

On January 1, 2004, Andy Shaw became Divisional Sales Manager and plaintiff's supervisor. DSUMF ¶ 10. Throughout his time as plaintiff's supervisor, Shaw found and documented a series of shortcomings in plaintiff's performance. For example, on February 12, 2004, Shaw led a meeting attended by plaintiff and the other New York Regional Vice Presidents. Hess Dep. 223. After the meeting, Shaw informed plaintiff by e-mail that plaintiff had a "persistently negative attitude" and was "outwardly disgruntled," and that he should focus on improving his attitude and activity. Hess Dep. at 223-27, 240-47, Ex. 23. A second problem arose on February 26, 2004, when plaintiff went to Florida for a meeting with a client based there. DSUMF ¶ 21. Plaintiff admits that Florida was not within his territory and that he did not obtain approval before attending the meeting, although he claims he believed approval was not necessary. Hess Dep. at 250-54; Plaintiff's Statement of Undisputed Material Fact ("PSUMF") ¶ 21. Plaintiff also admits, however, that his supervisor in 1999 instructed him by letter that "In the future, it is expected that you will follow the direction of management and if you want to set up or attend a meeting outside of your territory, it must have prior approval." Hess Dep. at 253-54, Ex. 14.[2] Although plaintiff was required to keep accurate records of his appointments, he could not explain why he failed to enter the Florida meeting in the company's computerized calendar system, SalesLogix, which is monitored and verified in advance by the defendant to keep track of employee activity. DSUMF ¶ 21; Hess Dep. at 255, 264-66, Ex. 27.

This was not the only time plaintiff failed to enter his schedule accurately into defendant's tracking system. On March 8, 2004, plaintiff scheduled six appointments in New

---

[2]Plaintiff contended at oral argument that the directive quoted in the text referred to an internal training meeting and was not meant to apply to meetings with clients held for the purpose of making sales.

York, but failed to attend them because he traveled to West Chester, Pennsylvania to meet with a new wholesaler. Hess Dep. at 267-69. Plaintiff admits that he entered these six meetings into SalesLogix in mid-February 2004, Hess Dep. 268-69, and that he deleted the entries only after he had missed the appointments, thereby violating defendant's policy on accurate and timely bookkeeping. DSUMF ¶ 22; PSUMF ¶ 22; Hess Dep. at 267-69, Ex. 26, 27. Yet again, on March 15, 2004, plaintiff had several appointments scheduled, and he marked these appointments as "complete" in SalesLogix despite the fact that he was in Florida on that date and did not attend the meetings. Hess Dep. at 270-72; DSUMF ¶ 23.

On March 23, Shaw e-mailed plaintiff to discuss his concerns about plaintiff's February 26 trip to Florida, the deleted appointments from March 8, and the appointments scheduled but not kept on March 15. Hess Dep., Ex. 26; DSUMF ¶ 24. In response, plaintiff provided a document relating to the Florida meeting to prove its validity, asserted that he rearranged his schedule on March 8 without entering the changes in SalesLogix, and claimed that the appointments originally scheduled for March 15 were held instead on March 22. Hess Dep., Ex. 26; DSUMF ¶ 25. Plaintiff did not offer a coherent explanation for the discrepancies between his calendar entries and his activities.

On April 7, 2004, unsatisfied with plaintiff's explanations, Shaw placed plaintiff on "Final Written Warning" for violating ING's Code of Conduct. Hess Dep., Ex. 27. Shaw stated that the trip to Florida was outside of plaintiff's territory and thus required prior authorization. *Id.* Shaw also asserted that the deleted meetings on March 8 and the meetings marked "completed" on March 15 were both inaccurate and "appear[ed] to be misleading" representations in the SalesLogix system. *Id.* Shaw cited a portion of ING's Code of Conduct

3

stating that it is "against company policy for any employee to cause our books and records to be inaccurate in any way." *Id.* Shaw's memorandum warned plaintiff: "Should you fail to show immediate and sustained improvement, or should other performance issues arise, your employment with ING is in jeopardy." *Id.*

Within a few days of receiving the Final Written Warning, plaintiff submitted a complaint to the human resources department at ING, alleging age discrimination. Hess Dep., Ex. 29. The complaint was based primarily on Hess' allegation that, two months earlier, Shaw remarked, "I hope I can teach an old dog new tricks." *See* Hess Dep., Ex. 30; DSUMF ¶¶ 41-42. In his complaint to human resources, plaintiff stated that "I believe that Andy [Shaw] feels that because of my age I can't perform my duties as a Wholesaler." Hess Dep., Ex. 29. An employee from human resources spoke with plaintiff and then e-mailed him, with a copy to Shaw's supervisor, Bill Lowe, responding to plaintiff's claim. Hess Dep., Ex. 30. Human resources found no basis for plaintiff's claim, specifically noting that plaintiff asserted no examples or factual basis for his contention that Shaw felt he was too old, and instead based his allegation of discrimination only on an "overall feeling." *Id.* The e-mail also discussed the performance problems raised by Shaw that plaintiff complained were discriminatory, and found that Shaw's criticisms were justified. *Id.* It noted that, although plaintiff claimed that he was never told that he needed prior approval before traveling outside of his territory, plaintiff's prior manager told Hess in November 2002, after Hess expensed a trip to California, that he needed prior approval to take such trips. *Id.* The e-mail also noted that plaintiff offered inconsistent explanations for the March 15 scheduling mishap – first telling Shaw that he subsequently changed his scheduling, Hess Dep., Ex. 26, yet later claiming that he "inadvertently pressed the complete bar" which marked the meetings

4

completed, Hess Dep., Ex. 28.

In July 2004, after the Final Written Warning was issued, plaintiff missed a mandatory and scheduled sales meeting. DSUMF ¶ 27; PSUMF ¶ 27. Plaintiff admits that, despite the final warning, he purposefully skipped the meeting, PSUMF ¶ 27, and later told Shaw that he did not attend because he had "better things to do." Hess Dep. at 309-10, Ex. 32. Shaw e-mailed plaintiff on July 21, 2004, to address plaintiff's deficiencies and indicate where improvement was necessary. Hess Dep., Ex. 32; DSUMF ¶ 28. In the e-mail, Shaw reiterated his concern for plaintiff's negative attitude and informed him that missing mandatory meetings, as well as responding that he had "better things to do," was unacceptable. Hess Dep., Ex. 32. Plaintiff had also misrepresented a product's availability to a broker at a national brokerage firm, and Shaw told plaintiff to follow up with the broker to provide the correct information about the product. Hess Dep., Ex. 32; DSUMF ¶ 28. Shaw emphasized to plaintiff that he must review ING's products before presenting them to brokers and clients, and further asserted that accurate representations of product availability were essential to ING's reputation and relationships with brokerage firms. Hess Dep., Ex. 32; DSUMF ¶ 28.

In late July 2004, Shaw discovered that plaintiff had again misrepresented one of the company's products to a broker, this time in order to prevent a client from placing an order with a rival company. Shaw Dep., Ex. 7. Shaw placed plaintiff on paid leave pending an investigation of the underlying circumstances. Hess Dep., Ex. 33-34. Hess admitted misrepresenting the product, but claimed he had simply made an honest mistake. Hess Dep. at 317-22, Ex. 34; PSUMF ¶ 29. According to a contemporaneous e-mail from Shaw to his boss, Bill Lowe, the broker at issue reported that Hess had presented him with an ING product,

asserting that it was more beneficial to a client that was about to purchase a rival company's product. Shaw Dep., Ex. 7. The client agreed to purchase ING's product instead, but when the broker was filling out paperwork, he realized that it was not available with the terms Hess had presented. *Id.* When contacted by the broker, Hess said that "he had made a big mistake and always got confused as to what features were available in specific products." *Id.* The broker's firm was one of the largest regional firms with which ING conducted business, and Shaw felt that the situation damaged ING's relationship with the broker and his firm. *Id.*

On July 29, 2004, Shaw, in consultation with Bill Lowe, terminated plaintiff's employment. Shaw Dep. at 18; Hess Dep., Ex. 36. Shaw provided plaintiff with a written statement of the reasons for his termination, including his failure to participate in the July 6, 2004 telephone conference, misrepresenting product offerings to clients, and more generally, failing "to meet the terms detailed in your Final Written Warning relative to keeping all other aspects of your performance at a satisfactory level . . . ." Hess Dep., Ex. 36.

The problems Shaw experienced while supervising plaintiff were not new ones. Plaintiff's prior supervisors had similar difficulties. In June 1999, Jim McInnis, plaintiff's supervisor at the time, e-mailed plaintiff regarding a failure to follow company procedures for extending invitations to a company meeting, with the result that a relationship with a client was jeopardized. Hess Dep. at 138-40, Ex. 13; DSUMF ¶ 13. In the e-mail, McInnis stated that he was "mystified" by plaintiff's conduct and told plaintiff: "Once again, failure to follow the simple rules regarding meetings, and the process for extending invitations, has resulted in wasted time and loss of at least one producer." *Id.* On August 29, 1999, Bayard Closser, plaintiff's supervisor at the time, sent plaintiff a memorandum warning him that his "current job

6

performance [was] not meeting the expected standards." Hess Dep., Ex. 14; DSUMF ¶ 14. The letter noted plaintiff's failure to meet sales expectations, his unauthorized trips, his improper release of confidential client information, and a request by a client that plaintiff not be assigned to cover its offices based on "concerns of [plaintiff's] ability to effectively interface with their representatives." Hess Dep. at 142-43, 147-49, Ex. 14. Then, in November 2000, plaintiff misrepresented a company product, which caused a broker to lose $75,000. DSUMF ¶ 15; PSUMF ¶ 15. As a result of that incident and other performance problems, Closser placed plaintiff on a Performance Improvement Plan. Hess Dep., Ex. 16.

The Performance Improvement Plan imposed by Closser informed plaintiff that, as a result of ongoing concerns with plaintiff's performance, which persisted despite the numerous meetings held to discuss them, plaintiff needed to "immediately improve [his] communication and interaction skills, as [his] overall performance." *Id.* The Plan required plaintiff to provide written updates and notifications to his supervisor, and to hold a specific number of meetings and achieve a specified volume of sales. *Id.*

Nevertheless, plaintiff's problems at work continued. In May 2001, plaintiff made statements to a client that were interpreted as inappropriate tax advice, and plaintiff was reprimanded by a supervisor other than Shaw and informed that providing tax advice to clients was against company policy. Hess Dep., Ex. 18; DSUMF ¶ 16. During his deposition, plaintiff admitted making the statements, but contended that he did so appropriately. Hess Dep. at 181-83; PSUMF ¶16. In yet another incident, in July 2001, plaintiff arranged a seminar, but when it was cancelled, failed to inform the invited attendees and was thus charged for the costs incurred. Hess Dep., Ex. 19; DSUMF ¶ 17. Finally, in May 2003, plaintiff was reprimanded by Jim

7

McInnis for attempting to sell a product to a broker for a client that was not within the company's guidelines, without getting prior approval. Hess Dep. at 195-97, Ex. 20; DSUMF ¶ 18. It was with this employment history that Hess came under Shaw's supervision.

## Discussion

Summary judgment is appropriate where "there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). An issue of fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991). In reaching a summary judgment determination, the court must resolve ambiguities and draw reasonable inferences in favor of the nonmoving party. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162,167 (2d Cir. 1991).

The moving party bears the initial burden of establishing that there are no genuine issues of material fact; the non-moving party may defeat summary judgment by producing specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). Conclusory allegations, however, are insufficient and "[t]here must be more than a 'scintilla of evidence'" to defeat a motion for summary judgment. *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512).

Executive Law section 296 of the New York State Human Rights Law makes it unlawful for an employer, "because of the age . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in

compensation or in terms, conditions or privileges of employment." Claims of discrimination brought under the New York State Human Rights Law are analyzed pursuant to the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817 (1973) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505-07, 113 S. Ct. 2742, 2752 (1993), for claims brought pursuant to Title VII of the Civil Rights Act of 1964. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466-67 (2d Cir. 2001). *See also Ferrante v. American Lung Ass'n*, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25 (1997) (noting that Executive Law section 296 standards are "in accord with Federal standards under title VII of the Civil Rights Act of 1964").

The three-step burden-shifting analysis used by courts to determine whether a party has established discrimination provides as follows:

> [A] plaintiff must first establish a prima facie case of age discrimination. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action.

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (*citing McDonnell Douglas*, 411 U.S. at 802-04).

For the purposes of this decision, I assume without deciding that plaintiff has come forward with evidence sufficient to establish a prima facie case of age discrimination. Defendant has, in turn, presented evidence of what it contends are legitimate, non-discriminatory reasons for terminating plaintiff's employment. I therefore turn to the question of whether plaintiff has come forward with sufficient evidence, assuming its truth, to support a finding that defendant's

purported reasons for firing him are a pretext for age discrimination.

As discussed above, plaintiff's evidence of discrimination rests on a single, stray remark. In contrast, defendant's proffered basis for terminating plaintiff is well-documented with memoranda and e-mails prepared at the same time as the events they reflect. As set forth in detail above, these memoranda and e-mails indicate several respects in which plaintiff's performance was considerably deficient.

Courts confronting similar facts have repeatedly granted summary judgment in favor of the employer. For example, in *Getschmann v. James River Paper Co., Inc.*, 822 F. Supp. 75, 78 (D. Conn. 1993), *aff'd*, 7 F.3d 221 (2d Cir. 1993), plaintiff sought to support his claim of discriminatory termination by alleging that his supervisor stated that "it sometimes is difficult to teach an old dog new tricks," and that he was "set in his ways." *Getschmann*, 822 F. Supp. at 78. The defendant provided "a variety of documents, including memoranda of review sessions" between the plaintiff and his supervisor, attesting to "plaintiff's decline in performance and inability to meet account executive objectives." *Id.* at 77. The court granted the employer's motion for summary judgment, finding that "alleged comments alone cannot satisfy the burden of proving pretextual discrimination" where the defendants provide overwhelming evidence of a legitimate business reason for terminating the plaintiff. *Id.* Similarly, in *Hansberry v. Father Flanagan's Boys' Home*, 2004 WL 3152393 (E.D.N.Y. Nov. 28, 2004), the court granted summary judgment to an employer in a case involving alleged racist remarks and documented performance issues because "[s]tray offensive remarks with a minimal nexus to the adverse employment action cannot raise an inference of discrimination, even when made by a decision maker." *Hansberry*, 2004 WL 3152393, at *6. *See also Adia v. MTA Long Island R. Co.*, 2006

WL 2092482 (E.D.N.Y. July 26, 2006) (noting that "'stray remarks' alone do not support a discrimination suit" and granting employer's summary judgment motion); *Molin v. Permafiber Corp.*, 2002 WL 31760215, at *5-7 (S.D.N.Y. Dec. 9, 2002)*, aff'd,* 73 Fed. Appx. 511 (2d Cir. 2003) (finding that allegedly ageist statements, as well as the fact that the plaintiff was replaced by someone nine years younger, were insufficient to prevent summary judgment because the defendants demonstrated without contradiction that the plaintiff fell behind on his responsibilities); *Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding an allegedly discriminatory remark insufficient to defeat summary judgment because it was isolated and did not relate to the decision to terminate); *Boyle v. McCann-Erickson, Inc*., 949 F. Supp. 1095, 1101-02 (S.D.N.Y. 1997) (dismissing plaintiff's claims and finding that ageist statements that were not connected to the plaintiff's discharge were insufficient to demonstrate pretext); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 667-70 (W.D.N.Y. 1992), *aff'd*, 995 F.2d 1147 (2d Cir. 1993) (finding allegedly ageist remarks, even though made by someone involved in the challenged employment decision, were not sufficient to defeat a motion for summary judgment where the statements were not made in the context of an employment decision and the defendants demonstrated that plaintiff's performance was deficient through "numerous memoranda from plaintiff's supervisors").

Plaintiff's repeated references to being a high earner, Pl.'s Mem. 2, 3, 6, 14, 18, are insufficient to overcome defendant's proof of a legitimate reason for termination. Defendant does not contend that plaintiff was fired for failing to reach sales goals, but rather for the various performance problems set forth above. Courts have held that, where other performance issues are presented without meaningful dispute as the basis for an adverse employment action, high

11

sales figures or other indicia of business success will be insufficient to defeat summary judgment. *See Adia*, 2006 WL 2092482, at *7 (pointing to case law holding that "prior satisfactory evaluations do not tend to show termination based on discrimination" (*citing Viola v. Philips Med. Sys.*, 42 F.3d 712, 718 (2d Cir. 1994))); *Molin*, 2002 WL 31760215, at *1, *7 (granting the employer's summary judgment motion despite plaintiff's "excellent performance"); *Spence*, 803 F. Supp. at 669 (noting that, even if the plaintiff was economically successful, the record demonstrated serious concern for his management style and thus showed a legitimate reason for termination).

Plaintiff's contention that Shaw's criticisms of his performance were a pretext for discrimination is further belied by Hess' undisputed history of similar performance issues even while supervised by others. Plaintiff argues that Shaw was not aware of these prior problems and that they are therefore irrelevant to the pending motion. However, the record does not support plaintiff's contention. Shaw stated that when he took over as plaintiff's supervisor, Shaw discussed the history of plaintiff's performance problems with plaintiff's two prior supervisors. *See* Shaw Dep. at 72-76. Moreover, even if Shaw were not aware of plaintiff's prior history, that history would still be relevant because it would tend to show that the faults Shaw found in Hess' performance were consistent with the experiences of plaintiff's prior supervisors and not the result of discrimination.

Plaintiff's argument that Shaw was mistaken in his understanding that plaintiff was authorized to make sales outside of New York also fails to support his claim of discriminatory animus. *See* Pl.'s Mem. 6-8. Even if plaintiff is correct in his contention that Shaw was wrong to criticize him for making out of state sales, that assertion would not be actionable. A

termination based on a misinformed conclusion about performance deficiencies is not actionable and, under the circumstances here, including overwhelming evidence of other performance problems, there is no basis for inferring that Shaw reached this conclusion because of plaintiff's age. *See Rodriguez v. City of New York*, No. 05 Civ. 5117 (JFB), at 16 (E.D.N.Y. Feb. 11, 2008) (noting that "the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."); *see also Rorie v. United Parcel Service, Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) ("[T]he relevant inquiry was whether [the plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable.").

Plaintiff's reliance on *Ferrante v. Am. Lung Ass'n*, 90 N.Y.2d 623, 687 N.E.2d 1308 (1997) is similarly unavailing. Although the employer's motion for summary judgment was denied in *Ferrante*, the facts of that case are distinguishable from those presented here. In *Ferrante*, the plaintiff alleged a "campaign of harassment and discrimination," including ageist remarks made in front of other employees. *Id.* at 626. Furthermore, the defendants gave no reason for firing plaintiff at the time they terminated him, and instead produced only one memorandum detailing the plaintiff's deficiencies that was prepared one month after the plaintiff's termination, thus calling its credibility into question. *Id.* at 627-28. Here, in contrast, the situation is the exact reverse: several performance issues were raised and documented by a succession of supervisors prior to plaintiff's termination, and plaintiff alleges only a single discriminatory comment, first making the allegation months after the comment was purportedly

13

made and immediately after plaintiff was issued a final warning. Thus, as in *Hansberry*, "plaintiff's showing that the defendant's reason for terminating him was false is exceedingly weak," and defendant's explanation of its reasons for firing plaintiff "is both consistent and compelling." 2004 WL 3152392, at *7.

## Conclusion

In light of the substantial evidence of performance issues, including client complaints, missed meetings, and a negative attitude, and in further light of the extremely scant evidence of discriminatory animus, removed in time from the termination decision, I hold that plaintiff has failed to raise a genuine issue of material fact for trial. Accordingly, defendant's motion for summary judgment is granted.

So Ordered.

/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
February 14, 2008.

U:\ASB 2007-2008\Hess v. ING\Hess v. ING ORDER draft 021108.wpd